UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


TAMA GORDON,

       Plaintiff,

v.                                    Civil Action No. 2:14-cv-25502

RUSH TRUCKING CORPORATION,

       Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>


      Pending are the parties' cross-motions for summary judgment, filed June 16, 2015 and July 31, 2015.  Plaintiff has moved for summary judgment on her claim under the Fair Labor Standards Act, and on her wage collection claim under the West Virginia Wage Payment and Collection Act.  Defendant has moved for partial summary judgment as to plaintiff's FLSA claim.


<u>Background</u>


      Plaintiff Tama Gordon ("Gordon") was employed by defendant Rush Trucking Corporation ("Rush Trucking") in various capacities between 2004 and 2013.  From March 2011 until September 2013, the period in issue, plaintiff worked as a truck dispatcher, although the parties dispute her precise title and

job duties.[1]  This suit arises because Gordon claims that she was
not paid appropriately during and after her tenure at Rush
Trucking.

Plaintiff first claims that, during her employment as
a truck dispatcher, she was not paid for her weekly overtime
work in a manner consistent with federal law.  As explained by
plaintiff, the company agreed to pay her a base salary of $650
for the first 40 hours each week, and she was to be paid

---

[1] The court notes that plaintiff is not consistent in describing
the period for which damages are sought.  Although it is clear
that the period ends in May, 2013, when Rush Trucking began to
pay plaintiff on an hourly basis, plaintiff is unclear on
whether she is owed pay for work beginning March 1, 2011 or
September 5, 2011.  See Pl. Mem. Resp. to Def. Mot. For Part.
Summ. J. and Mem. In Supp. Of Pl. Mot. For Summ. J. (hereinafter
Pl. Mot. For Summ. J.) at *22 (requesting damages based on one
hour of overtime per day, and weekend work, from March 1, 2011
until May 1, 2013); *6 ("Ms. Gordon's claim is for the time
period of September 5, 2011 (three years [from] the date of the
filing of her complaint) until May 2013.").
    The court notes that a two-year statute of limitations
generally applies to FLSA actions, "except that a cause of
action arising out of a willful violation may be commenced
within three years after the cause of action accrued."  See 29
U.S.C. § 255(a).  The greater weight of authority holds that
"[a] new cause of action accrues at each payday immediately
following the work period for which compensation is owed."  Dent
v. Cox Commc'ns Las Vegas, Inc., 502 F.3d 1141, 1144 (9th Cir.
2007); see also Knight v. Columbus, Ga., 19 F.3d 579, 581 (11th
Cir. 1994)(collecting authorities stating that an FLSA cause of
action accrues with each paycheck); but see Bayles v. Am. Med.
Response of Colorado, Inc., 937 F. Supp. 1477, 1489 (D. Colo.
1996)("Under the FLSA, a cause of action accrues at the end of
each regular workday.").  Thus, Gordon may, at most, seek relief
for those paychecks received on or after September 5, 2011, as
this suit was brought on September 5, 2014.

overtime for any additional hours she worked beyond the first
40.  A typical work week for plaintiff consisted of five 10-hour
shifts, for a total of 50 hours.  The company deducted five
hours per week, however, for lunch breaks that she claims she
was not able to take.  Thus, in a typical 50-hour work week,
plaintiff claims that she was paid a base salary of $650 for 40
hours of work, plus overtime compensation for five hours, but
she would not be paid overtime for the remaining five hours she
spent working through lunch.  Plaintiff claims that the
company's failure to pay her for working during her "lunch
breaks" violated federal law.  She seeks to recover the unpaid
overtime for five hours each week.

Plaintiff also states that she was required to work as
an "on-call" dispatcher for 48 hours every third weekend.  An
"on-call" dispatcher responds to truck drivers' problems at any
time, and, to this end, plaintiff was required to be near a
cellphone and computer whenever she was "on call."  Plaintiff
was paid a total of $100 for each 24-hour day she was "on call,"
which, in plaintiff's view, did not comport with federal-law
requirements for overtime pay.

Plaintiff complains, also, that Rush Trucking failed
to transmit her final paycheck in a timely fashion when she was
discharged from the company.  She was discharged on September 9,

2013, but she received her final paycheck on September 20, 2013. In plaintiff's view, the delay runs afoul of West Virginia laws requiring that discharged employees be paid promptly.

Defendant Rush Trucking contends that Gordon was employed in a "bona fide administrative capacity" from March 2011 until May 2013, after which she was reclassified as an hourly employee and her duties were altered.  The company claims that, during the period when she was a "bona fide administrator," which is the entire period of concern in this lawsuit, Gordon would have been exempt from any FLSA requirements for overtime pay.

Plaintiff initiated this action on September 5, 2014. Her complaint raises two counts – one alleging violations of the FLSA because she was not paid for overtime work, and the other alleging a violation of the West Virginia Wage Payment and Collection Act because of her delayed final paycheck.  Pl. Compl. ¶ 11, 13-14, 16, 22.

### The Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

4

matter of law." Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

     A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the initial burden of showing — "that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).  Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.

## The FLSA Claim

The FLSA establishes a forty-hour work week for employees, and it requires that additional hours of work be compensated at one-and-one-half times the employee's usual rate of pay.  29 U.S.C. § 207(a)(2).  Certain types of employees are exempt from this requirement, and thus may work overtime for a rate of pay less than "time and a half."

### a. The Administrative Exemption

Defendant contends that plaintiff was employed in a "bona fide administrative capacity," thus exempting her from the FLSA's overtime rules.  See Mem. in Supp. of Def. Mot. for Summ. J. at 5; see also 29 U.S.C. § 213(a)(1) (noting that provisions of section 207 "shall not apply with respect to any employee employed in a bona fide . . . administrative . . . capacity").

"Employers must prove by clear and convincing evidence that an employee qualifies for exemption."  Shockley v. City of Newport News, 997 F.2d 18, 21 (4th Cir. 1993).  "[W]here the . . . 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could

reasonably find for either the plaintiff or the defendant."
<u>Liberty Lobby</u>, 477 U.S. at 255. "For example, there is no
genuine issue if the evidence presented . . . is of insufficient
caliber or quantity to allow a rational finder of fact to find
[for the party carrying the burden] by clear and convincing
evidence." <u>Id.</u> at 254.

"Whether an employee is exempt from the FLSA's
overtime requirements is a mixed question of law and fact."
<u>Williams v. Genex Servs., LLC</u>, 809 F.3d 103, 109 (4th Cir.
2015). "The question of how the [employees] spent their working
time [. . .] is a question of fact. The question whether their
particular activities excluded them from the overtime benefits
of the FLSA is a question of law." <u>Id.</u> (quoting <u>Icicle Seafoods,
Inc. v. Worthington</u>, 475 U.S. 709, 714 (1986))(alterations added
and in original).

The Department of Labor has promulgated regulations
that implement the "administrative capacity" exemption relied on
by defendant in this case. Under the Department's regulations,
the exemption applies to any employee:

> (1) Compensated on a salary or fee basis at a rate of
> not less than $455 per week . . . ;
>
> (2) Whose primary duty is the performance of office or
> non-manual work directly related to the management or

general business operations of the employer or the
employer's customers; and

(3) Whose primary duty includes the exercise of
discretion and independent judgment with respect to
matters of significance.

29 C.F.R. § 541.200(a). Given plaintiff's base salary of $650
per week, the parties agree that the first of these three
requirements is satisfied, and that "[e]lements (2) and (3) are
at issue herein." Pl. Mem. Resp. and Mem. in Supp. of Summ. J.
at *13.

The second and third elements of § 541.200(a) both
concern the worker's "primary duty." Additional regulations
clarify that "[t]he term 'primary duty' means the principal,
main, major or most important duty that the employee performs."
29 C.F.R. § 541.700(a). In determining an employee's "primary
duty," the court considers factors such as "the relative
importance of" the employee's various duties, "the amount of
time spent" on different functions, "the employee's relative
freedom from direct supervision; and the relationship between
the employee's salary and the wages paid to other employees for
the kind of nonexempt work performed by the employee." See id.

The second element requires that an employee's primary
duty be "the performance of office or non-manual work directly
related to the management or general business operations of the

8

employer or the employer's customers."  29 C.F.R. §

541.200(a)(2).  The regulations provide examples of work that

tends to fall within this definition:

> Work directly related to management or general
> business operations includes, but is not limited to,
> work in functional areas such as tax; finance;
> accounting; budgeting; auditing; insurance; quality
> control; purchasing; procurement; advertising;
> marketing; research; safety and health; personnel
> management; human resources; employee benefits; labor
> relations; public relations; government relations;
> computer network, internet and database
> administration; legal and regulatory compliance; and
> similar activities. Some of these activities may be
> performed by employees who also would qualify for
> another exemption.

29 C.F.R. § 541.201(b).  The regulations also clarify that the

requirement is meant to be satisfied by "work directly related

to assisting with the running or servicing of the business, as

distinguished, for example, from working on a manufacturing

production line or selling a product in a retail or service

establishment."  29 C.F.R. § 541.201(a).

        Our court of appeals has clarified that supervisory

work or direct contribution to a business's policies and

strategies is generally required to fulfill the "management or

general business operations" element.  See Calderon v. GEICO

General Ins. Co., 809 F.3d 111 (4th Cir. 2015); Desmond v. PNGI

Charles Town Gaming, L.L.C., 564 F.3d 688 (4th Cir. 2009).  In

Desmond, the Fourth Circuit reversed a finding that officials at

a racetrack qualified for the administrative exemption, stating
that the employees "have no supervisory responsibility and do
not develop, review, evaluate, or recommend [the employer's]
business policies or strategies with regard to the horse races."
564 F.3d at 694.  The fact that the employees' positions were
"important to the operation of the racing business" did not
change the reality that "those positions are unrelated to
management or the general business functions of the company."
Id.  In Calderon, the court used the same reasoning and language
in finding that investigators working for an insurance company
did not meet the administrative exemption.  809 F.3d 111, 124
("Like the racing officials in Desmond . . . , the Investigators
have 'no supervisory responsibility and do not develop, review,
evaluate, or recommend [the insurance company's] business
polices or strategies with regard to the' claims they
investigated."); but see Withrow v. Sedgwick Claims Mgmt. Serv.,
Inc., 841 F. Supp. 2d 972, 979 (S.D.W. Va. 2012) ("I recognize
that in Desmond . . . the Fourth Circuit noted that the racing
officials did not have supervisory responsibility and did not
review or recommend Charles Town Gaming's business policies. . .
. .  But these responsibilities are not required for an
employee's work to relate to the general business operations of
an employer . . . .")(internal citations omitted).

The third element requires that the employee's primary duty "include[] the exercise of discretion and independent judgment with respect to matters of significance."  29 C.F.R. § 541.200(a)(3).  "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered."  29 C.F.R. § 541.202(a).  "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources," and it "does not include clerical or secretarial work, recording or tabulating data, or performing other mechanical, repetitive, recurrent or routine work."  29 C.F.R. § 541.202(e).

The regulations suggest a number of areas for consideration in the factual analysis of whether the employee exercised discretion and independent judgment:

> Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a

> particular segment of the business; whether the
> employee has authority to commit the employer in
> matters that have significant financial impact;
> whether the employee has authority to waive or deviate
> from established policies and procedures without prior
> approval; whether the employee has authority to
> negotiate and bind the company on significant matters;
> whether the employee provides consultation or expert
> advice to management; whether the employee is involved
> in planning long- or short-term business objectives;
> whether the employee investigates and resolves matters
> of significance on behalf of management; and whether
> the employee represents the company in handling
> complaints, arbitrating disputes or resolving
> grievances.

29 C.F.R. § 541.202(b).

Although "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision," it "does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review."  29 C.F.R. § 541.202(c).

The Department's regulations give a number of examples of types of employees who would satisfy both elements discussed above, and thereby qualify for the administrative exemption.  29 C.F.R. § 541.203.  Key among these are insurance claims adjustors, analysts and advisors in the financial services industry, executive assistants to business owners or senior executives, human resources managers (though not lower-level

human resource "clerks"), and purchasing agents who have authority to commit their companies to large purchases.  See id.

Dispatchers at trucking or other equipment companies have, in the past, presented especially thorny problems for courts interpreting the FLSA.  Courts have arrived at differing results – typically after bench trials - depending on the precise duties of the employees in question.  See, e.g., Rock v. Ray Anthony Intern., LLC, 380 Fed. Appx. 875 (11th Cir. 2010)(affirming district court finding that crane dispatcher qualified under administrative exemption); Donovan v. Flowers Marine, Inc., 545 F. Supp. 991 (E.D. La. 1982)(finding at bench trial that tugboat dispatchers qualified as administrators); Christenberry v. Rental Tools, Inc., 655 F. Supp. 374 (E.D. La. 1987)(finding at bench trial that employee who served dual role as "damage and inventory clerk/relief dispatcher," whose duties included inspection of used equipment for damages, as well as receipt and execution of orders from customers, did not qualify as administrator); Marshall v. National Freight, Inc., 1979 U.S. Dist. LEXIS 9989 (D. N.J. Sept. 6, 1979)(finding at bench trial that trucking dispatchers did not qualify as administrators).

The Eleventh Circuit's Ray Anthony opinion, which affirmed the factual findings of a district court, provides a helpful example of which dispatcher positions are properly

13

classified as "administrative."  As in the present case, there was no dispute that the crane dispatcher, Rock, met the statutory requirement as to minimum salary.  380 Fed. Appx. at 876.  The court found that Rock met the second requirement of the test, that his work "directly relate[] to 'the management or general business operations of the employer or the employer's customers,'" because "Rock effectively managed Sunbelt's crane rental department."  Id. at 877.  As the court explained, his "primary job duties" included the following:

> customer communication, choosing the appropriate crane for specific jobs, assigning operators to cranes, overseeing other employees, preparing and reviewing job tickets, and maintaining the crane rental schedule. He was also responsible for selecting the type of materials, supplies, machinery, equipment, and tools that were needed to meet the customers' needs.

Id.

The court then found that the third element requiring discretion and judgment was satisfied, as "Rock exercised substantial control over the day-to-day operation of Sunbelt's crane rental business."  Id. at 880.  The court of appeals summarized the district court's findings as follows:

> Rock . . . was responsible for directing and overseeing all operators, truck drivers, riggers, oilers, and erection crews. . . .  [H]e exercised discretion as to which customers' jobs each employee should be assigned and what equipment is required to

14

> perform the job properly.  [H]e exercised independent
> judgment in deciding which employees to send, and
> where to send them, based on the employees' experience
> and reliability. . . .  Rock had to exercise
> independent judgment in the event of an emergency as
> he was the first line of communication and had to
> determine how best to resolve the conflict and ensure
> that the customer's needs were being met despite such
> emergency.  Rock . . . required neither input nor
> approval when making these decisions. . . .  Rock had
> supervisory authority to hire and fire employees, even
> though he never exercised that authority.

Id. at 879 (internal quotation marks and citations

omitted).  The facts undergirding Rock's classification as

an administrator thus show a deep involvement in

supervising personnel and in designing plans to suit the

needs of the business's clients.  The Eleventh Circuit's

decision was also driven by Rock's ability to make

independent decisions on important matters in the first

instance, even if not on every subject.  These features of

Rock's job plainly mirror the focus on management or

business operations, and discretion, that is expressed in

29 C.F.R. § 541.200.


   b. Gordon's Work Duties


        In order to resolve the issues of whether Gordon's

"primary duty" was managerial and required the exercise of

discretion — which are questions of law - the court first must

attempt to determine "how [she] spent [her] working time," which

is "a question of fact."  <u>Williams</u>, 809 F.3d at 109.  The record

in this case presents limited and conflicting evidence regarding

Gordon's work duties at Rush Trucking.

Gordon's deposition includes probably the fullest

explanation of how she spent her working time:

> Q [from defense counsel]. Can you walk me through kind
> of a typical work day as a dispatcher at Rush
> Trucking, particularly for that time period of 2012?
> If your days kind of changed over time, and I don't
> know if they did or not, but just give a sense of what
> you actually did during your work day.
>
> A [from Gordon]. I would come in, I would log on to
> the computer and immediately start taking phone calls.
> If there was other tasks, like if I had to go over
> with drivers, their point system, I would start on
> that. When there was a break in the phone calls, which
> was rarely, I would call the drivers and start going
> over their point system with them. And the paperwork,
> I had to print out the paperwork for the drivers and
> put them in the envelopes and write the load onto the
> envelope so they know who - you know, which one is
> theirs.
>
> Q. The phone calls, who were you talking on the phone
> with during the day?
>
> A. Anybody that called.
>
> Q. And would that be primarily drivers or customers or
> both?
>
> A. Primarily drivers.
>
> Q. What types of driver issues where [sic] you
> handling by phone during the day?
>
> A. They would call us and tell us that they're there,
> at the shipper, or that they're leaving the shipper.

> Or just every time they make a stop to pick up
> freight, they would call me and tell me they were
> there and then when they left, they would call and
> tell me they were leaving. And this was a lot of
> drivers so it pretty much kept me busy all day.

Gordon Dep. 32-33.[2]  Gordon thus states that her job consisted
almost entirely of taking drivers' phone calls, and that the
calls mostly related to scheduling and record-keeping ("They
would call us and tell us that they're there, at the shipper, or
that they're leaving the shipper.").

    Her deposition discusses other tasks she completed,
such as determining appropriate steps after an accident or
breakdown, including arranging alternative transportation where
necessary, id. at 22, 38, 41, talking with drivers about their
status with the "point system" consisting of the company's
program for monitoring driver safety and documentation-
completion records, id. at 23-24, 33-35, providing training, id.
at 24, and completing special projects such as a training
booklet and a log of breakdowns, id. at 42, 50-51.  But she
describes these activities as occupying a relatively minor
amount of her time and focus compared to answering the phone and
speaking with drivers throughout the day.  Id. at 36 ("It was

---

[2] The entirety of Gordon's deposition appears as Exhibit A to
plaintiff's response memorandum in opposition to defendant's
motion for partial summary judgment and plaintiff's motion for
summary judgment.  (ECF 32-1).

very seldom that any special things came up because we really didn't have the time for it. I mean, the phone did not stop ringing."). She also emphasizes, repeatedly, that she deferred to her supervisor, Tony Jennings, on all but the most ministerial matters. See, e.g., id. at 37 ("[O]ne customer called saying that there was a mess in their bathroom after our driver left. And I would tell them, you know, I apologize, I'll talk to my boss about it and let him know what's going on. And I would inform Tony that this is what they said.").

On the other hand, Rush Trucking's paper records cast Gordon principally as a manager and administrator. Counsel for defendant point to the company's January 2013 description of her job, as well as a performance evaluation from October of 2012. Rush Trucking claims that, during the disputed time period, Gordon's job title was "Driver Manager." See Diaz Declaration ¶ 3; Diaz Declaration Ex. 1 (hereinafter "Driver Manager Job Description").[3] Duties of a "Driver Manager" are summarized thusly:

> JOB SUMMARY[:] The Driver Manager serves as a liaison between the company and its driver fleet. The Driver Manager manages the relationship across time and

---

[3] Descriptions of both of the positions that Rush Trucking claims that Gordon held — her exempt position of Driver Manager and her later hourly position of Customer Service Representative - are attached to Diaz's declaration and discussed within the declaration. (ECF 25-1).

> ensures driver pickup and delivery transactions meet
> customer and company specifications as to timely
> delivery, safety and quality.  Driver Managers monitor
> and improve the performance of Drivers and serve as
> first point of contact for Driver inquiries and
> concerns.  Driver Managers use considerable discretion
> and judgment in evaluating the performance of Drivers
> and their opinions and recommendations are a
> significant factor in decisions to retain or terminate
> drivers.

Driver Manager Job Description at *1.  The summary states that a

Driver Manager is focused on evaluating and improving the

performance of drivers over time, as well as helping to make

decisions regarding the retention of drivers.  Id.  The work of

the Driver Manager in "serv[ing] as first point of contact for

Driver inquiries," which Gordon described as her main job duty,

is mentioned in the summary as but one part of the overall

supervisory relationship.

     The remainder of the Driver Manager job description is

consistent with the summary's managerial focus.  For example,

the document states that Driver Managers "evaluat[e] the factors

that impact on-time delivery and anticipat[e]/address[] problems

before they arise," and find "solutions to unexpected problems"

by "us[ing] job and industry knowledge and experience to make

practical decisions about course[s] of action."  Id. at *1-2.  A

Driver Manager also "[m]anages unseated equipment to ensure

maximum equipment utilization" and "ensures equipment is

maintained in optimum condition."  Id. at *2.  Finally, the

document suggests that Driver Managers must "take appropriate action to retain good drivers" and also make recommendations to higher managers by "[b]ring[ing] forth suggestions for improvements in process."  Id. at *1-2.

This 2013 job description, although not signed by Gordon, reiterates many of the statements in a performance review from 2012 signed by Gordon and her supervisor, Tony Jennings.[4]  See 2012 Performance Evaluation.  The performance review gave Gordon a "very good" rating in the category of "Initiative/Judgment," which examined whether she "Seeks solutions to unexpected problems, acts promptly and decisively, [and] uses job and industry knowledge to make practical, routine decisions about course of action."  Id. at *2.  Gordon also received a "very good" rating as to "Business Acumen," which asked whether she "Understands why as well as how; connects job tasks to expected outcomes and recognizes and brings forth suggestions for improved efficiency."  Moreover, the review includes a section regarding her supervisory skills, and it gave Gordon "good" ratings on several supervision-related metrics such as "plans and organizes team's work, establishes appropriate priorities and promotes teamwork amongst staff of

---

[4]  The review was discussed during Gordon's deposition, and is attached to a portion of the deposition reproduced by defendants.  (ECF 36-3).

own and other units," and "Effectively selects and motivates workers, encourages employee development and growth and provides meaningful, specific feedback." <u>Id.</u> The presence of these entries suggests that she spent more time and focus on supervision and management than her deposition might at first suggest.

Handwritten comments appended to the performance review by Gordon's supervisor also suggest that her work was principally managerial. Jennings, her supervisor, described Gordon's "most significant contributions" during 2012 by noting that "Tama created a breakdown log to monitor route progress and has kept up with all mechanical breakdowns at Buffalo," thus suggesting that the log played a larger role in her work than Gordon's deposition would indicate. <u>Id.</u> at *3. In the last section of the report, which allowed the supervisor to add any additional comments, Jennings wrote the following:

> Tama is very knowledgeable of all of our routes and is very driver friendly, almost to the point of being a downfall. We are currently getting her in the mindset of being a driver manager and not a driver. Once she overcomes the driver mentality she will become an invaluable asset to Rush Trucking.

<u>Id.</u> This comment suggests that Gordon viewed herself as a helper to the company's drivers, but that her position was

supervisory in nature, and Jennings hoped she would more fully embrace her managerial role with the passage of time.

### c. Application of Regulations to Gordon's Work Duties

The differences between the factual pictures presented by Gordon and Rush Trucking preclude a summary determination of Gordon's FLSA status.  As discussed above, to prevail on an FLSA exemption at the summary judgment stage, an employer must show that no reasonable jury could fail to find, by clear and convincing evidence, that the exemption applies.  See Shockley, 997 F.2d at 21; Liberty Lobby, 477 U.S. at 255.  Likewise, a prevailing employee will have shown that no reasonable jury could find, by clear and convincing evidence, that the exemption applies.

If a jury credited Gordon's testimony, and disbelieved the company's paperwork, then it could find that Gordon's "primary" job duty, which is to say, her "principal, main, major or most important duty," 29 C.F.R. § 541.700(a), was answering the phone and writing down when and where loads were delivered.  See Gordon Dep. at 32-33.  The jury could further believe that her involvement with any special projects or supervisory tasks was minor, because, in Gordon's words, "the phone did not stop ringing."  Id. at 36.  And they could believe that she deferred

to her supervisor about almost everything, including what to do about a driver who made a mess in the client's bathroom.  Id. at 37.  Particularly because the defense has produced no direct testimony from anyone who worked at Rush Trucking contemporaneously with Gordon and observed her duties, a jury could find Gordon's testimony more credible than the paper file offered by the defense.

If Gordon's primary job duty was answering phones and entering numbers into a record, then she plainly would not qualify for the "bona fide administrative" exemption.  To begin, these tasks do not meet the standard of being "directly related to the management or general business operations of the employer or the employer's customers," which, as explained above, generally requires that an employee have "supervisory responsibility" or "develop, review, evaluate, or recommend [the employer's] business policies or strategies," Desmond, 564 F.3d at 694.  Answering the phone and keeping a record does not contribute to Rush Trucking's business policies or strategies, and one who simply records the movements of drivers does not "supervise" in any meaningful sense.[5]

_____

[5] Rush Trucking argues that Gordon's work was "directly related to management or business operations" of the company because "Rush's trucking business obviously could not operate properly without its dispatch department."  Mem. Of Law in Supp. Of Def.

Moreover, these duties do not "include[] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200. In order to answer the phone and keep a record, Gordon would not need to engage in the "comparison and the evaluation of possible courses of conduct," which is the description the regulations give of discretion and judgment. 29 C.F.R. § 541.202(a). Her work would instead have been akin to "clerical or secretarial work," a type of activity singled out as not requiring the use of discretion and judgment. See 29 C.F.R. § 541.202(e).

On the other hand, a jury could principally rely on the information presented in Rush Trucking's documentary evidence. If so, the jury could find that the managerial tasks Gordon has admitted to performing were far more central to her job than she claims, and that her "primary duty" at Rush Trucking consisted of supervising the drivers' overall work and development, handling unplanned incidents, and completing high-level special projects. Gordon herself stated that she performed general supervisory tasks such as training new

---

Mot. For Partial Summ. J. (hereinafter "Def. Mot. Summ. J.") at *13-14. This argument has been squarely rejected by the Fourth Circuit. See, e.g., Desmond, 564 F.3d at 692 ("[T]he indispensability of an employee's position within the business cannot be the ratio decidendi for determining whether the position is directly related to the employer's general business operations.").

drivers, talking to experienced drivers about their safety records, and instructing drivers as to compliance with government regulations after interpreting such regulations; that she dealt with accidents and breakdowns; and that she completed special projects such as authoring a training manual and creating and maintaining a log for breakdowns.  See Gordon Dep. at *23 (discussing interpretation of regulations); *24 (discussing training of new drivers); *25-26 (discussing conversations with drivers as to safety records); *27-28, *38-39 (discussing planning during accidents); *42 (discussing training booklet).  Even if Gordon did not spend most of her time on these duties, they could still make up her "primary duty" because of their "relative importance" compared to her other work.  See 29 C.F.R. § 541.700(a).  For example, Jennings identified Gordon's work on the breakdown log as the sole item on the list of her "most significant contributions" in 2012. See 2012 Performance Evaluation at *3.

       A principal focus on these three duties is consistent with the 2012 performance review.  Beyond stating that the creation of the accident log was Gordon's most important contribution that year, the review also notes that she had performed competently in skills related to general supervision, such as "select[ing] and motivat[ing] workers, encourag[ing]

25

employee development and growth and provid[ing] meaningful, specific feedback." Id. As discussed above, her supervisor stressed that Rush Trucking was "getting her in the mindset of being a driver manager and not a driver," thus emphasizing the supervisory focus of the position. Id. at *3. And the report gave her a high rating for "[s]eek[ing] solutions to unexpected problems." Id. at *2. This version of her duties is also more consistent with the 2013 job description, which largely mirrors the language of the 2012 performance review and casts her position as chiefly managerial.

This view of the evidence would mean that Gordon qualifies for the administrative exemption under the FLSA.[6]  Her

---

[6] Plaintiff's briefing includes a number of arguments related to how Rush Trucking viewed Gordon's FLSA status, as well as its view of its payment practices, during the disputed period. Gordon states that her manager, Tony Jennings, told her that the company had begun to pay her on an hourly basis for weekend work because its previous practices were illegal; she asserts that Rush Trucking reclassified her as an hourly employee without changing her duties; she notes that she always received some form of "overtime" pay, suggesting a non-exempt position; and she cites various emails and manuals that she believes establish the company's view that she was not an exempt employee. See Pl. Mot. Summ. J. at *8 (discussing handbook and Gordon's overtime pay during period when she was arguably exempt); *10 (stating that Gordon was reclassified as hourly employee without change in duties); *10-11 (stating that supervisor told her previous weekend pay was illegal); Pl. Repl. To Def. Mot. for Summ. J. at *3, 7 (discussing emails regarding Gordon's overtime pay).
    Without discussing each of these pieces of evidence individually, the court simply notes that a jury could believe that Rush Trucking's subjective view of Gordon's FLSA status is not especially probative of her actual work duties.  Evidence

position, first, would have been "directly related to the
management or general business operations of the employer."
Gordon's general supervision of the drivers' work, which
included giving them advice and coaching on safety records and
on necessary steps for compliance with federal regulations,
would plainly constitute "supervisory responsibility," and also
demonstrates a role in the development of the company's policies
as to safety and legal compliance.  See Desmond, 564 F.3d at 694
(interpreting second element of test as requiring that employee
had "supervisory responsibility" or acted to "develop, review,
evaluate, or recommend [the employer's] business policies or
strategies").  Moreover, her responsibility to undertake
contingency planning, including the performance of tasks such as
choosing replacement drivers and other companies to complete
work when necessary, would constitute additional "supervisory
responsibility" over a number of employees.

　　　　Her work on special projects such as the training
handbook and the record-keeping system for accidents would also
contribute to the "develop[ment]" of Rush Trucking's "policies

---

that discusses her duties themselves, such as the company's
documents, its performance reviews, and portions of Gordon's
testimony, may shed more light upon the reality of her work.
Because the court views all evidence in the light most favorable
to Rush Trucking when resolving Gordon's motion for summary
judgment, these materials will not lead the court to grant the
motion.

or strategies" that were "directly related to assisting with the running or servicing of the business."  See Desmond, 564 F.3d at 694; 29 C.F.R. § 541.200(a)(2) (requiring that the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"). Because a training handbook determines how new employees go about doing their jobs, choosing its content is arguably among the most important policy-setting functions within a business. And designing a system for keeping track of accidents could similarly play a key role in how a business understands its failures, and changes its behavior, over time.  Moreover, these tasks bear great similarity to work explicitly mentioned by regulations as exempt, such as personnel management and quality control.[7]  29 C.F.R. § 541.201 (providing examples of exempt work).

---

[7] As mentioned above, the regulations distinguish between "work directly related to assisting with the running or servicing of the business," which may be exempt, compared, "for example, [to] working on a manufacturing production line or selling a product in a retail or service establishment," which is not exempt.  29 C.F.R. § 541.201(a).  Our court of appeals has noted that "the administrative-production dichotomy is an imperfect analytical tool in a service-oriented employment context, [but] it is still a useful construct."  Desmond, 564 F.3d at 694.  In this case, Rush Trucking supplied the service of trucking transportation to its customers.  Gordon's work, which involved working with the drivers rather than delivering Rush Trucking's service,

Viewing the evidence most favorably to Rush Trucking would also show that Gordon's work involved discretion and independent judgment sufficient to satisfy the third element of the statutory test.  Certain of the tasks that Gordon discussed completing – such as deciding how to deal with accidents and interpreting federal regulations – plainly involve "the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered," 29 C.F.R. § 541.202(a).  So too would supervising drivers over time, with an eye to improving their safety records and performance.  Gordon's special projects would also involve substantial discretion.  The task of writing a training manual – which Gordon does not say was supervised – would involve a good deal of evaluation, decision-making, and judgment, and could be described as comparable to "formulat[ion] . . . [of] management policies or operating practices," which is specifically listed

_____

therefore falls on the "administrative" side of the distinction rather than the "production" side.
        The distinction is unhelpful in this case, however, because the question is essentially whether Gordon was a supervisor or a secretary to the drivers.  Neither of these roles would place her on the "production" side of the distinction.  Secretarial employees, despite being on the "administrative" end of the distinction, are not exempt from FLSA overtime requirements.  This is in part because their connection to the management of the business is insufficiently direct, and in part because their positions generally do not involve the type of discretion and judgment required of exempt employees.  See 29 C.F.R. § 541.202(e)(stating that clerical and secretarial work are not exempt).

as an activity that satisfies the statute's third element.  <u>See</u>
29 C.F.R. § 541.202(b).  Designing and maintaining a log of
accidents may also have involved such freedom, although the
documentary evidence regarding these records is slight.

Because of the limited and conflicting evidence
regarding Gordon's responsibilities at Rush Trucking, the court
is not able to settle the factual question of her "primary duty"
while an employee there.  Upon reviewing the record before the
court, a reasonable jury could find, by clear and convincing
evidence, that Gordon's primary duties satisfy the requirements
for the administrative exemption.  Such a jury could also find
that Rush Trucking has not carried its burden.  Accordingly, the
court will not grant either party's motion for summary judgment
on the FLSA claim.

<u>The West Virginia Wage Collection Claim</u>

On July 31, 2015, plaintiff moved for summary judgment
on her claim for wage collection under West Virginia state law.
<u>See</u> W. Va. Code § 21-5-4.  At the time of plaintiff's discharge
from Rush Trucking, and at the time that this case was filed,
Section 21-5-4(b) of the West Virginia Code read as follows:

> Whenever a person, firm or corporation discharges an
> employee, the person, firm or corporation shall pay

30

> the employee's wages in full no later than the next
> regular payday or four business days, whichever comes
> first.

W. Va. Code § 21-5-4(b)(2013).  The statute gives employers a

maximum of four business days to pay any wages to a discharged

employee, although the deadline comes sooner if a regular payday

occurs within those four days.  Id.  The statute further states

that, if an employer fails to pay a discharged employee within

the specified time, then "in addition to the amount which was

unpaid when due, [the employer] is liable to the employee for

three times that unpaid amount as liquidated damages."  W. Va.

Code § 21-5-4(e)(2013).

        Plaintiff contends that "Ms. Gordon was terminated [by

Rush Trucking] on September 9, 2013," but "was not paid her

final pay until September 20, 2013 when she . . . received

$1,046.09."  Pl. Mem Resp. and Mem. in Supp. of Summ. J. at *24.

Plaintiff cites deposition testimony in support of these claims.

See Shah Dep. at 23-25 (noting gross pay of $1,046.09, that

"September 20 was the last check," and that the check was

delivered by direct deposit).  Because the payment came far

later than "four business days" after her discharge, plaintiff

contends that the statute requires a payment of $3,138.27 from

Rush Trucking to Ms. Gordon.

Defendant Rush Trucking chose not to respond to this portion of plaintiff's motion for summary judgment. "If a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c)," the court may "consider the fact[s] undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(3). In this case, given defendant's silence regarding the wages owed to Ms. Gordon when she was discharged and the date on which they were paid, along with the appropriate documentation of those matters, the court considers the allegations undisputed.

Because Rush Trucking owed Ms. Gordon wages when she was discharged, and because the wages were paid more than four business days after her discharge, Rush Trucking violated W. Va. Code § 21-5-4(b). The wage collection count simply requests the statutory penalty for a violation of § 21-5-4(b), and summary judgment is thus appropriate for plaintiff on that count on both liability and liquidated damages of $3,138.27.

<u>Conclusion</u>

For the reasons set forth above, the court ORDERS that plaintiff's motion for summary judgment be, and it hereby is, granted as to defendant's liability, and damages of $3,138.27, for the wage collection claim.

32

The court further ORDERS that, in all other respects, plaintiff's motion for summary judgment, and defendant's motion for partial summary judgment, be, and they hereby are, denied.

The Clerk is directed to transmit copies of this order to counsel of record and any unrepresented parties.

ENTER: March 10, 2016

John T. Copenhaver, Jr.
United States District Judge